IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| TERRY JOHNSON, obo T.H., | ) | |
| | ) | CASE NO. 1:15-CV-648 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | KENNETH S. McHARGH |
| SECURITY ADMINISTRATION, | ) | |
| | ) | OPINION & ORDER |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to Local Rule 72.2(b).  The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Terry Johnson's ("Plaintiff" or "Mr. Johnson")  application, on behalf of his minor child ("T.H." or "claimant") for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq* is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Magistrate Judge finds that the decision of the Commissioner is not supported by substantial evidence, and orders the decision be VACATED, and the case be REMANDED back to the Social Security Administration.

## I.  PROCEDURAL HISTORY

Plaintiff Terry Johnson, on behalf of his minor son, T.H., applied for Supplemental Security Income benefits on August 11, 2009, alleging disability due to ADD/ADHD, pervasive

development disorder (PDD), and learning disability, with an onset date of January 2, 2004  (Tr. 17, 87, 224, 234). The Social Security Administration denied Plaintiff's applications on initial review and upon reconsideration.  (Tr. 87).

Plaintiff requested that an administrative law judge convene a hearing to evaluate his application.  (Tr. 129).  On March 15, 2011, a video hearing was held before Administrative Law Judge Sue Leise.  (Tr. 87-99). Both T.H. and Plaintiff appeared, represented by attorney John Paul Orch, and Plaintiff testified.  (*Id.*).   On April 29, 2011, the ALJ issued a decision finding T.H. was not disabled.  (*Id.*).  Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council.  (Tr. 59-63).  The Appeals Council granted his request for review, and subsequently remanded the case back to an administrative law judge. (Tr. 104).

On January 16, 2013, an administrative hearing was held before Administrative Law Judge Penny Loucas ("ALJ"). (Tr. 14-31). Both T.H. and Plaintiff appeared, with counsel, and testified before the ALJ.  (*Id.*).   On April 18, 2013, the ALJ issued a decision finding T.H. was not disabled.  (*Id.*).  Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council.  (Tr. 37).  The Appeals Council denied his request for review, making the ALJ's April 18, 2013, determination the final decision of the Commissioner. (Tr. 1-4).  Plaintiff now seeks judicial review of the ALJ's final decision pursuant to 42 U.S.C. § 1383(c).

## II.  EVIDENCE

### A.  Personal Background Information

T.H. was born on August 3, 1998, making him a school-aged child on the date of the application and an adolescent on the date of the ALJ's decision, under 20 C.F.R. 416.926a(g)(2). (Tr. 17, 201).  At the time of the hearing, T.H. was 14-years-old and in the Eighth Grade.  (Tr. 52).

B.  Medical Evidence[1]

T.H. was referred for treatment at Applewood Centers, Inc., on April 28, 2005, due to an inability to concentrate and fighting with peers.  (Tr. 439).  His history documented he was taking Adderall, had a speech impairment including difficulty articulating words, and had possible developmental delays.  (Tr. 440).  Plaintiff indicated T.H. only wanted to play video games, was generally not interested in playing with peers (but will play video games with other children), and did not engage in outside activities.  (*Id.*).  Other school information listed that T.H. fought with peers and required continuous redirection to tasks.  (*Id.*).  The assessment noted problems with anger/aggression, impulsivity, inattention, mood swings, and sleep problems, specifically that, despite a 9:00 p.m. bedtime, T.H. would stay awake until 11:00 p.m. or midnight.  (Tr. 444).  T.H. exhibited problem behaviors both at school and at home, but notes indicated he maintained positive relationships with his family and was respectful with adults.  (Tr. 441, 445).  At that time T.H. was given a GAF score of 50, indicating serious symptoms or serious impairments in social, occupational, or school functioning.  (Tr. 444).

A psychiatric evaluation was performed at Applewood by Catherine Nageotte, M.D., a child adolescent psychiatrist, on May 18, 2005.  (Tr. 456).  His history documented that T.H. was held back in Head Start because he did not know his letters and had difficulty speaking, and he was currently enrolled in Kindergarten, receiving full time special education services, per Plaintiff's report.  (*Id.*).  Examination notes stated T.H. made intermittent eye contact and interacted with Dr. Nageotte in a "very instrumental fashion," did not seem to comprehend everything she was saying, and was unable to answer questions about himself, although he talked about his video games and fighting.  (Tr. 457-58).  The examiner further noted T.H. played

_____

[1] The following recital of Plaintiff's medical record is an overview of the medical evidence pertinent to Plaintiff's appeal.  It is not intended to reflect all of the medical evidence of record.

Legos throughout the examination and wanted to "complete something," asked Plaintiff for help locating specific shapes, did not express any degree of frustration, and was largely cooperative when asked to do things, although he ignored Plaintiff's request to clean up the Legos.  (*Id.*). T.H. was diagnosed with Attention Deficit Disorder, combined type, Pervasive Developmental Disorder, NOS, Developmental Coordination Disorder, Receptive and Expressive Language Disorder, possible mental retardation, in utero exposure to alcohol and drugs, a history of problems with primary support group (extreme) and severe education problems, with a current level of functioning at 45.  (Tr. 458-59).  Dr. Nageotte recommended further assessments and services through the county, continued T.H. on Adderall, and started him on Clonidine to reduce hyperactivity and facilitate sleep onset.  (Tr. 459).

At a follow-up on June 21, 2005, Dr. Nageotte noted Plaintiff reported T.H. had not yet started Clonidine, and that the effects of Adderall seemed to be wearing off, although he was not experiencing any side effects.  (Tr. 460).  On examination, T.H. was reasonably cooperative but focused only on what he wanted to do (again building with Legos), and diagnoses listing ADD, combined type, and Asperger's d/o.  (*Id.*).  Dr. Nageotte increased his Adderall dose, started him on Clonidine, and again referred T.H. for additional assessment and services with the county. (*Id.*).  On July 18, 2005, Dr. Nageotte noted Plaintiff's reports that the Clonidine helped T.H. fall asleep, which seemed to give him more energy and improve his attention and focus, but that the Adderall made him "more hyper."  Again observing reasonable cooperation but focus only on what T.H. wanted to do (build with Legos), Dr. Nageotte continued T.H. on Clonodine, discontinued Adderall, and started him on Concerta to target inattention, impulsivity, and hyperactivity.  (Tr. 461).

On August 30, 2005, Plaintiff reported to Dr. Nageotte that T.H. was interacting with others more regularly, although he still preferred video games and did not want to play outside with his brother or a friend.  (Tr. 462).  Plaintiff stated T.H. was more talkative, although Plaintiff did not always understand him, and his Clonidine dose was increased. (*Id.*).  Follow-up records dated October 24, 2005, showed Plaintiff reported T.H. was doing well in school, talking more (although sometimes too much), and Dr. Nageotte observed that he was interacting well, transitioning without difficulty, and was not hyperactive, and continued his medications.  (Tr. 463).

Examination reports dated December 2005 and February 2006 showed that Plaintiff reported T.H. was doing well in school and making progress, although he was receiving Ds and Fs on his report cards.  (Tr. 464-65).  Although no behavioral problems were reported in December, in February 2006 exam notes showed T.H. was suspended for hitting a peer and participating in a food fight.  (*Id.*).  At that time Plaintiff stated T.H. was not doing as well as before, was again not sleeping well, and inquired whether the medications could be increased.  (Tr. 465).  Noting his worsening behaviors, Dr. Nageotte increased his medication.  (*Id.*).  Examination notes dated every other month from March 2006 through November 2006 showed Plaintiff reported T.H. was generally doing well in school and sleeping better, although occasionally showing stubborn and less talkative behaviors.  (Tr. 466-71).  Further, although T.H. continued to prefer staying indoors and playing video games, Plaintiff reported claimant enjoyed reading and would play outside when made to.  (*Id.*). Overall T.H. was cooperative and not hyperactive during examinations, but continued to only want to talk about what he likes and build with Legos.  (*Id.*).

Records showed T.H. changed schools for the 2006-2007 school year, and continued to see Dr. Nageotte every few months for examination and medication management.  Dr. Nageotte documented T.H. Ohio Scales problem scale scores indicating moderate and low level problems, and some troubles on functioning scale scores.  (Tr. 472).  In January and April of 2007, Plaintiff reported T.H. had some problems at school getting along with his peers, but was generally doing well academically, requiring some additional help in certain subjects.  (Tr. 471-73).  On July 9, 2007, Plaintiff reported his medication was affective, T.H. was doing his school work and following directions, and he was pleased with his progress.  (Tr. 474).  However, on October 8, 2007, Dr. Nageotte observed mild hyperactivity, and Plaintiff remarked that T.H. was struggling with focus, more hyperactive during the day, and that the medication was again wearing off earlier.  (Tr. 475).  Despite increasing his medication, in January and April of 2008, Plaintiff reported T.H. was struggling in school, primarily with social aspects of rules and interacting with his peers.  (Tr. 475-76).  In December of 2008, Plaintiff reported T.H. earned an F in reading for not turning in an assignment, and a D in social studies, has concerns that T.H.'s speech is getting worse, but that his medication is effective in reducing symptoms of ADHD.  T.H. reported that he is easily distracted in class and cannot focus because there are too many other students.  (Tr. 482).

Dr. Jaishankar took over Plaintiff's care in 2009.  (Tr. 556).  In April of 2009, T.H. was reported as "not doing well" and was observed as exhibiting hyperactive, although cooperative, behavior.  (Tr. 484).  Plaintiff reported T.H. was earning Ds and Fs, that he was more hyper, distracted, and off-task, and that teachers called complaining of disruptive behavior and reports that T.H. was not listening.  (*Id.*).  VB Scale scores indicated "a lot of symptoms of ADHD" and Plaintiff stated the medications were no longer effective.  (*Id.*).  T.H.'s medications were

modified to address his ADHD symptoms.  (Tr. 485).  Despite this, a letter from T.H.'s teacher from May of 2009 indicated an increase in disruptive behavior during the previous three weeks (including disrupting the learning process, having an extremely difficult time listening and following directions, and increasing impulsivity and failure to follow simple classroom rules) while noting these behaviors have been evident all year.  (Tr. 244).  Further, Plaintiff reported claimant would stay in his room playing video games when at home, had difficulty following directions and doing chores, and was more oppositional.  (Tr. 486).  Further, it was noted that his medication wore off in the afternoon, but that the letter from his teacher did not say whether his behavior was worse in the morning or in the afternoon.  (*Id.*).  Examination notes dated July of 2009 indicated at that time T.H. was doing better, that Plaintiff was happy with his progress, his afternoon medication helped with his ADHD symptoms, but that he was still having difficulties with pronunciation.  (Tr. 489).  There were no reports of major outbursts or physical aggression in his 2009 examination notes, although he was observed as still having difficulties with pronunciation, exhibiting argumentative and hyperactive behaviors in December of 2009, as well as continued reports of struggles with peer interactions.  (Tr. 484, 487, 489, 491, 495, 510).

Plaintiff continued treatment through Applewood with Jeffrey Smith, M.D., a child and adolescent psychiatrist, beginning April 1, 2010.  (Tr. 555-57).  Progress notes from his transfer appointment reviewed his history of breakthrough ADHD symptoms and medication increases and modifications, as well as noting previous missed appointments.  (Tr. 556-57).  Dr. Smith noted T.H. was taking his medication regularly and with no side effects, and that CTRS forms from his teachers showed subclinical ADHD scores for both morning and afternoon, although they noted he appeared anxious and perfectionist all day.  (Tr. 557).  Dr. Smith did not, at that time, have any information regarding his grades, but Plaintiff reported he was doing well at

home, and he noted significant progress for his ISP for inattention and hyperactivity.  (*Id.*).  Dr. Smith observed T.H. engaged easily and wanted to talk about peers at school picking on him, that he had trouble following the flow of the conversation, and that he did not respond appropriately unless a question was repeated three or four times.  (*Id.*).  The diagnoses of ADHD and PDD, as well as his current medication plan, were continued, and Dr. Smith noted his "[m]edication response is excellent."  (*Id.*).

After failing to show for a scheduled appointment on August 6, 2010, progress notes dated September 2, 2010 indicated T.H. reported he was focusing well in school and had not been in trouble for breaking rules.  (Tr. 559-60).  Plaintiff affirmed he was doing well, and T.H. was observed as focusing relatively well during the session, engaging easily, and sharing information about his classes.  (Tr.  560).  Notes also documented that T.H. had a good interaction with a boy he did not know in the waiting room, approaching him and helping him tie his shoe.  (*Id.*).  Progress notes again reported T.H. had an excellent response to medication, and was showing significant progress with inattention and hyperactivity.  (*Id.*).

Examination notes dated November 22, 2010, showed conflicting medication response patterns reported, some suggesting all day problems, while others indicating better mornings *or* improvement in the afternoon; the examiner noted these reports are highly inconsistent and that the status of his ISP for inattentiveness and hyperactivity was unclear.  (Tr. 602-03).  The examiner observed T.H. was easily engaged and focused relatively well, although he gave three different reports of his daily school activities and medication schedule.  (Tr. 602).  Plaintiff further reported his afternoon medication wore off by 6:00 p.m., and that T.H. must show problem behavior all day, as he received morning calls from T.H.'s teachers complaining he will not stop talking or do his work.  (Tr. 602-03).  At this time the examiner increased both of T.H.'s

8

medications, and modified the dosing schedule.  (*Id.*).  Treatment notes dated March 2, 2011, showed similar observations on examination, and indicated T.H. was doing well overall following the medication changes.  (Tr. 641).

On April 5, 2011, Plaintiff reported he believed the medication was helping but that T.H. continued to struggle in school, namely that he received calls from school personnel a couple times per week with complaints of talking in class and failure to complete assignments.  (Tr. 640).  Claimant stated he received two failing grades on his most recent report card, but did not remember in what subject, and complained of being picked on frequently by peers.  (*Id.*).  Claimant was again observed as cooperative and easily engaged, although he exhibited rapid speech and required continuing redirection.  (*Id.*).  Medication was continued and Plaintiff requested a follow-up in twelve weeks due to transportation issues.  (*Id.*).

Treatment notes dated June 30, 2011 showed T.H. finished Sixth Grade with final grades ranging from As to Cs, and that he had acceptable behavior in school.  (Tr. 639).  Records show T.H. passed all of his OAAs, was not required to take summer school, and was involved in a summer program two days per week with swimming and other activities, although he expressed that he was not interested in outdoor activities and needed more time to play his games.  (*Id.*).  Dr. Smith observed T.H. again focused relatively well and was easily engaged during the session, and noted some progress in his ISP of inattention and hyperactivity.  (*Id.*).

In December of 2011, Plaintiff reported T.H. was doing well in Seventh Grade and attended a new school, which was a better fit.  (Tr. 636).  T.H. reported that he liked his new school, remarking "at least everyone doesn't hate me," and Plaintiff stated he no longer got phone calls with behavior complaints from school personnel.  (*Id.*).  Noting some progress, Dr. Smith observed T.H. interrupted and required frequent redirection, exhibited rapid speech at

times, and had poor articulation, and documented Plaintiff's report that he talked too much at home and continued to be very interested in video games.  (*Id.*).  Notes dated March, 2012 again showed some progress and that T.H. maintained primarily Bs and Cs, but that he continued to "have trouble 'with his mouth'" and demonstrated rigid thinking.  (Tr. 635).  However, examination notes reported no major behavioral concerns in March and June of 2012, and that Plaintiff felt he was responding adequately to medication.  (Tr. 631, 635).  The record showed Plaintiff and T.H. missed two appointments in June of 2012.  (Tr. 633-34).

Examination notes dated September 13, 2012, showed T.H. had progressed to the Eighth Grade and reported good concentration during the school day.  (Tr. 629).  Plaintiff reported T.H. was doing well overall and that the medication seemed to be working well enough and long enough, and that he was pleased with progress.  (*Id.*).  On examination T.H. continued to require frequent redirection upon interrupting, and to exhibit rapid speech and poor articulation.  (*Id.*).

C. Educational Evidence/School Reports

T.H. was a student at Lorain City Schools up to Seventh Grade.  An ETR was completed on May 23, 2007, when T.H. was eight years old and in the Second Grade.  (Tr. 249-50).  The report indicated at that time T.H. was receiving 90 minutes of small group instruction, as well as twenty minutes of speech therapy, per week.  (Tr. 250).  The Reynold's Intelligence Assessment Scales showed T.H. was currently functioning within average range of cognitive abilities and exceeded 32% of others his age.  (Tr. 251).  A diagnostic assessment battery showed he performed within the borderline to average range in Reading, Writing, and Math, with strengths in Reading and deficits in Writing and Math.  (Tr. 253).  Based on this, the evaluator opined that he "may experience difficulty adhering to academic standards at third grade level due to academic deficits in overall Mathematics and Written Expression."  (*Id.*).  The report further

identified that T.H. was easily distracted and has trouble maintaining attention and concentration in class, but was successful when accommodated with repeated directions, extra time to complete tasks, clarification of directions and assignments, visual support and small group or individual settings.  (Tr. 254).  Overall, the report indicated T.H. did not achieve adequately or meet state-approved grade level standards in the areas of oral expression, written expression, mathematics calculation, and mathematics problem solving, finding he has a Specific Learning Disability, and that he has a severe discrepancy between achievement and ability that adversely affects his educational performance.  (Tr. 259, 263).

Included in the ETR was a communicative status assessment by Speech-Language Pathologist Dallas York, who found T.H. often responded correctly to questions, although he often had to repeat his answers for clarity.  (Tr. 255).  Ms. York observed that his conversational speech was composed of run-on sentences, distortions of sounds, and a rapid rate of speech, but that it is understood with careful listening.  (*Id.*).  Ms. York opined that his communication may affect his classroom performance.  (*Id.*).  T.H. also exhibited satisfactory gross motor skills, but would benefit from additional fine motor activities, as he had weakness in his handwriting skills.  (Tr. 256).  An in-class observation showed T.H. exhibited task-relevant behavior 84% of the time, and was inattentive 16% of the time (playing with books or staring around the room), but listened to the teacher read a story and raised his hand to answer a question, although also blurted out answers other times.  (Tr. 258).

An IEP review dated December 3, 2008, conducted while T.H. was in Fourth Grade, documented a Basic score and minimal proficiency in Reading, and an Advanced score in Math on the Ohio Achievement Test.  (Tr. 265).  Further assessments performed in September and October of 2008 showed scores of 553 and 461, respectively, in Reading, which was noted as

11

below the score of 600 for typical peers.  (*Id.*).  T.H. received an F on his report card in Reading due to missing assignments.  (Tr. 265).  Scores showed proficiency, and was reported as above average, in Math, although he received a D in Math due to poor test grades.  (Tr. 265-66).  Although he is described as being an eager and hard working student who is enthusiastic about learning, the IEP noted he often has difficulty managing time, completing assignments, carrying out plans, making decisions, and organizing his priorities.  (Tr. 266).  Also reported is extreme impulsivity in his communication skills, excessive talking, and a tendency to ramble unless cued to be clear, all leading to difficulty with peer relations.  (*Id.*).  Further, handwritten remarks on the report show T.H.'s deficits in oral and written expression impact his ability to complete grade level standards, and that he would benefit from working in small groups, guided practice and verbal cues to focus, and additional time and opportunities to complete and correct tests and tasks.  (*Id.*).  The IEP indicated T.H. responds well to both verbal and written cues.  (*Id.*).

In September of 2009, T.H.'s Fifth Grade teacher, Mrs. Washington, completed a Teacher Questionnaire, and reported he was proficient/at grade level in Reading and Math, and limited/below grade level in Written Language.  (Tr. 279-80).  Mrs. Washington check-marked boxes indicating T.H. had a Speech or Language Impairment as well as a Specific Learning Disability, but did not further specify.  (Tr. 280).  Under the domain of Acquiring and Using Information, she noted no very serious or serious problems in specified activities, although she indicated T.H. had obvious problems with comprehending oral instructions, understanding and participating in class discussions, expressing ideas in written form, and in applying problem-solving skills in class discussions.  (Tr. 281).  She further selected he exhibited a slight problem with reading and comprehending written material, providing organized oral explanations and adequate descriptions, learning new material, and recalling and applying previously learned

material, and no problems understanding school and content vocabulary or comprehending and doing math problems.  (Tr. 281).

In the domain of Attending and Completing Tasks, Mrs. Washington reported a daily, very serious problem with paying attention when spoken to directly, and daily slight problems with focusing long enough to finish assigned activities or tasks and refocusing when necessary. (Tr. 282).  Mrs. Washington reported a very serious problem with working without distracting self or others, a serious problem organizing his own things or school materials, and obvious problems with sustaining attention during play/sports activities, as well as completing class/homework assignments.  (*Id.*).  All other activities in this domain were listed as slight problems, and no problem in carrying out single step instructions.  (*Id.*).

In the domain of Interacting and Relating With Others, Mrs. Washington reported no very serious problems, but a daily serious problem with introducing and maintaining relevant and appropriate topics of conversation, daily obvious problems with seeking attention appropriately and taking turns in conversation, and a weekly obvious problem with making and keeping friends.  (Tr. 283).  Mrs. Washington chose only slight or no problems for the remaining activities in this domain, but specified T.H. sometimes loses focus during conversation, is redirected by prompting, and receives assistance from a tutor inside the regular classroom to help him stay focused and concentrate.  (*Id.*).  As a familiar listener, she indicated she can understand T.H.'s speech for both known and unknown topics of conversation one-half to two-thirds of the time.  (Tr. 284).  Mrs. Washington further reported no problems in the domain of Moving About and Manipulating Objects, and either no problems or slight problems in activities relevant to Caring for Himself.  (Tr. 285).

13

An IEP dated September 25, 2009, indicated T.H. was "in progress" addressing his goals in Writing and Reading, with a handwritten note stating he is a hard worker.  (Tr. 291-92). Services provided to address his goals included small group instruction, extended time to complete assignments, shortened assignments, orally read directions and tests, prompts and cues to remain on task and focus on lessons, and retake opportunities for failed tests and tasks.  (*Id.*). A form relating to his communication and speech abilities was also completed on September 25, 2009, and reported T.H. received 75 minutes of speech and language therapy per month, and had conversation intelligibility as follows:  85-90% known context; 75-85% unknown context; and 80-90% in conversation with self-repetition.  (Tr. 294).  On Oral and Written Language Scales, T.H. scored a 97 in Listening Comprehension, an 84 in Oral Expression, and an 89 in Oral Composite, which the reviewer confirmed reflected his communication functioning at that time. (Tr. 294).  She further noted that T.H. demonstrated fair stimulability within sentences and in conversational speech, but failed to utilize carryover strategies within everyday tasks and required continued therapy.  (*Id.*).  Additionally, the reviewer opined that his tendency to speak rapidly to utilize lowered prosody throughout conversations adversely impacted his ability to communicate his wants, needs, and thoughts.  (Tr. 295).

Another IEP dated June 2, 2010, stated the team would like to see T.H. communicate more effectively.   His profile indicated continuing problems with time management, organization, and completing assignments, as well as with peer interaction due to his excessive talking.  (Tr. 329).  He was described as trying hard and being sociable, willing to help other students in the group, but requiring prompting to stay focused and complete tasks.  (*Id.*).  He tested as proficient in Reading and Math, but not proficient in Writing, and earned an A in Social Studies, a B in Math, and Ds in both Science and English, after neglecting to turn in assignments

14

despite being given extra time to complete or correct them.  (*Id.*).  He was further described as still exhibiting below grade level achievement in Oral and Written Expression, leading to deficits in his ability to express himself and hindering his ability to complete grade level standards.  (*Id.*).  However, Listening Comprehension and Oral Expression, as well as voice, articulation, and fluency, were assessed as within normal limits, but he required prompting to improve the clarity of his speech.  (Tr. 332).  The IEP report indicated that without prompting, T.H. speaks rapidly and without appropriate word enunciation, and his overall speech intelligibility was negatively impacted.  (*Id.*).  Accommodations including cuing to return to task and focus, small groups, extended time, and oral directions and responses were documented, as well as those specific to improving his performance in the areas of Reading Comprehension and writing organization.  (Tr. 333-35, 339).  The IEP further documented T.H. was not excused from passing the Ohio Graduation Test and was not completing a curriculum that was significantly different from other students required to take the test.  (Tr. 339).

T.H.'s Fifth Grade report card showed overall grades of Bs, with one A and one C, and that he was moving on to Sixth Grade.  (Tr. 348).  Further, his teacher, Mrs. Washington, commented that he had really improved that school year.  (*Id.*).  A progress report from the same school year indicated that did well in reading activities but needed to work on turning in assignments and getting along with others during team talk discussions.  (Tr. 349).  However, teacher comments showed he improved in both areas as the year progressed, and should continue to be encouraged to do better.  (*Id.*).  Fifth Grade progress reports showed that although he earned a Satisfactory mark in Social Studies he was often disruptive in that class, but that he participated well in Music class.  (Tr. 357-58).  These reports showed he mostly earned Bs and Cs, but at some point during the year he was earning an F in Science and English due to missing

assignments, and Mrs. Washington requested Plaintiff speak with T.H. about his weekly progress.  (Tr. 357-58, 362, 364).

T.H. was suspended on January 27, 2010, and again on February 22, 2010, for one day resulting from physical aggression against another student.  (Tr. 350-54).  Records show the suspensions resulted from him hitting other students, the second time documented as without provocation.  (Tr. 352, 354).  Additionally, an undated note from T.H.'s middle school Language Arts teacher, Jeannette Chappell-Nettles, recounted that he is a very capable student when focused, but that he is often unable to focus or stay in his seat.  (Tr. 395).  Further, Ms. Chappell-Nettles observed that T.H. had trouble interacting with his peers, and that his lack of focus and poor social interactions severely impede his academic achievement.  (*Id.*).  Another undated Classroom Observation report, signed by D.B. Tuttle, a Success for All Reading teacher, noted T.H: had difficulty focusing and staying on task; was socially inept and was always getting into arguments with other students; demonstrated continuous attention getting behavior, talking out of turn, and using inappropriate language; was poor in his use of reading time; and failed to complete homework or class assignments in a timely manner.  (Tr. 397).

An amended IEP dated October 21, 2010, documented that T.H. was having extreme difficulties with attention and academics.  (Tr. 566).  It further stated that he was at that time failing most of his classes, and that his teachers reported he was not being successful in his current setting.  (*Id.*).  Further, it removed T.H. to the Resource Room for Language Arts, Math, Science, and Social Studies.  (Tr. 574).

On November 18, 2010, Karen McCombrie, T.H's Intervention Specialist, sent a letter home to Plaintiff reporting on T.H's behavior.  (Tr. 400-01).  Although noting he is a bright boy who tries very hard to fit in and do his work, Ms. McCombrie listed ongoing behavior problems

with focus and impulse control, including talking continually in class, failing to complete assignments, and lack of organization.  (Tr. 400).  Ms. McCombrie indicated T.H. had extreme difficulty focusing when any distractions were present, and that he required continual redirection and prompts to focus.  (*Id.*).  According to the letter, his excessive talking leads to conflict with students, and T.H. exhibits anger issues.  (Tr. 400-01).  His problem behaviors were reduced (but not eliminated) following his afternoon medication, and Ms. McCombie suggested a medication adjustment to help improve his overall functioning and peer relationships.  (Tr. 401).

T.H. enrolled in Summit Academy in the Fall of 2011 for his Seventh Grade year.  (Tr. 610).  An ETR assessment dated October 19, 2011, showed T.H. scored Extremely Low in Communication (specifically his difficulty paying attention, taking turns, calling out inappropriately, and trouble following directions with two or more steps) and Social Skills (noting of particular concern his difficulty making and keeping friends, and with interacting socially in general), Borderline in Functional Academics and Self-Care, and Average in other relevant skill areas.  (Tr. 650-51, 655-56).  Teacher assessments showed excessive talking, hyperactive behavior, need for constant redirection, and moderately outspoken behavior, but that he participated in lessons and did not impede other students' abilities to learn.  (Tr. 661-62, 664).  A Behavior/Personality Assessment conducted on October 18, 2011, by Sarah M. DiFilippo, M.Ed., LPCC, showed elevated scores for Attention Problems, Atypicality, Withdrawal, Leadership, and Study Skills, and noted T.H.'s behavior problems, including a high level of activity, impulsivity, tendency to isolate, and inability to organize and complete tasks independently, interfere with his academic progress and need addressed for him to be successful in school.  (Tr. 665-66).  The assessment further indicated T.H. exhibited significant behaviors in

17

the domains of Hyperactivity and Attention Problems, as well as "sometimes" exhibiting notable problems with Functional Communication.  (Tr. 670, 673-75).

An IEP dated November 11, 2011, documented that he was working on his social language skills, including learning to control his impulses and making better eye contact when conversing, but that he continued to struggle with pragmatic language skills.  (Tr. 610-11).  He scored in the 49th percentile on a Reading Comprehension measurement, and the IEP reported his only struggle in that subject area was with social context connections, relating to his own lack of social skills.  (*Id.*).  T.H.'s teacher reported he worked best in a small group instructional setting because he sometimes required extra assistance, he also benefitted from an isolated setting to minimize distractions, and needed constant redirection in the classroom to help him remain focused and keep him from speaking out of turn.  (Tr. 611-12, 619).  He continued to exhibit outbursts and impulsivity, and was unable to avoid distractions on his own.  (Tr. 619).  Further, although he was described as a fairly friendly student, his lack of social skills negatively impacted his peer relationships and conversations.  (Tr. 620).

November 2011 assessments showed T.H. was underdeveloped in verbal-linguistics and interpersonal intelligences, and the IEP stated he was unable to use correct sentence structure or grammar and punctuation, and could not identify nouns, adjectives, or adverbs.  (Tr. 613, 617).  T.H. exhibited below average expressive language skills, and significantly below average social language skills, scoring only 77 points on a Pragmatic Profile, with a minimum score of 142 required for him to meet his age criterion.  (Tr. 616-17, 647).  Further, despite age appropriate receptive language skills, it was noted that T.H. had weak skills in his ability to repeat or recall sentences.  (Tr. 617).  T.H. also was observed as having a moderate articulation delay, and making sound errors throughout conversations, often making it difficult to understand him in

class.  (Tr. 618).  His below average articulation skills was documented as a weakness that "may greatly affect [T.H.'s] ability to express himself clearly."  (Tr. 618, 648).

His IEP Annual Review dated January 9, 2013, showed he advanced to Eighth Grade for the 2012-2013 school year, and was a diligent worker in Reading with a decent vocabulary, but that he continued to struggle with social language skills and fluency, and his academic reading ability is affected by his speech and social skills.  (Tr. 691).  He portrayed a strong work ethic in Language Arts and made some progress in this area from the previous year, but continued to struggle with writing and sentence structure.  (Tr. 692).  T.H. self-reported he would like to improve in the following areas:  handwriting, speaking slower, staying on topic in a conversation, not speaking out of turn or too loud, and not dominating a conversation.  (Tr. 694).  He continued to exhibit below average articulation skills, with speech intelligibility varying from 0-100% due to rate variation, and an inability to self-monitor his rate of speech, but some response to verbal cues.  (Tr. 698).  T.H. also continued to exhibit below average expressive language and pragmatic language skills, despite some improvement from the previous year (noting 70% and 76% grammatical accuracy, appropriate turn taking in conversations 45% of the time, identifying correct responses 65% of the time, adjusting language during role playing 25% of the time, and using appropriate nonverbal supports 30% of the time), and required continued intervention so as to be successful in verbal expression.  (Tr. 700, 702).  In general, the IEP indicated that T.H. is intelligent and capable of being successful, but that he continued to struggle and require assistance during the school year due to overall interaction with peers, not responding to social cues, and difficulty expressing himself verbally, all of which impacted his emotional health, and partially impacted his ability to function in the classroom.  (Tr. 704).

D.  Plaintiff and Claimant's Reports and Testimony

On December 5, 2009, Plaintiff completed a Disability Report Appeal, indicating T.H.'s symptoms got worse over time, and that he gets daily work on his speech. (Tr. 298, 303). The report indicated T.H. was taking Focalin and Clonidine, prescribed by Dr. Jaishankar, with no reported side effects. (Tr. 301). A Disability Contact Form completed February 23, 2010, showed Plaintiff reported T.H.'s medications were no longer effective, he gets suspended from school for fighting and hits peers for no reason, although he gets along with his siblings. (Tr. 314). At home, Plaintiff stated T.H. does not help around the house, and if asked to do chores will do one thing then quit. (*Id.*). The report also indicated T.H. did not qualify for services from Murray Ridge Center School. (*Id.*).

At the hearing, Plaintiff testified that claimant has verbal outbursts in school even after a teacher tells him to be quiet, and that he must be told something three or four times before he understands it. (Tr. 44-45). He further testified that he has to stay right with claimant in order to get him to complete a task, including homework, although his teachers now make him finish his work before he goes home. (Tr. 45). Plaintiff testified claimant did not get along with his classmates due to his outbursts and communication skills, that he is not understandable when he gets just a little excited, and that he recently had behavioral problems at school, including fighting with other students. (Tr. 46-48, 56). Plaintiff reported some social interactions with one boy "just like how [claimant] is," as well as that claimant reported he talks to a girl, but that he usually just plays on the computer, seldom texts or calls anyone, and that he does not have friends in the neighborhood. (Tr. 48-50).

Claimant also testified at the hearing, and reported to the ALJ some of what he is learning in a specific class at school. (Tr. 51-52). Claimant testified that he is in Eighth Grade and that he has friends in the Sixth Grade, but none in his own, and that he previously had trouble with

another student, leading to suspension. (Tr. 52-54).  He further explained he has two friends he likes to hang out with after school, that he gets good grades and puts his school work ahead of everything else.  (Tr. 54).

## SUMMARY OF THE ALJ'S FINDINGS

The ALJ made the following findings of fact and conclusions of law:

1. The claimant was born on August 3, 1998.  Therefore, he was a school-age child on August 11, 2009, the date [the] application was filed, and is currently an adolescent.

2. The claimant has not engaged in substantial gainful activity since August 11, 2009, the application date.

3. The claimant has the following severe impairments: attention deficit hyperactivity disorder (ADHD), pervasive development disorder (PDD), and a learning disability.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings.

6. The claimant has not been disabled, as defined in the Social Security Act, since August 11, 2009, the date the application was filed.

(Tr. 17-30) (internal citations omitted).

## III.    STANDARD FOR CHILDHOOD SSI CASES

A child under age eighteen will be considered disabled if she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations." 42 U.S.C. § 1382c(a)(3)(C)(i).  Childhood disability claims involve a three-step process evaluating whether the child claimant is disabled.  20 C.F.R. § 416.924.  First, the ALJ must determine whether the child claimant is working.  If not, at step two the ALJ must decide whether the child claimant has a severe mental or physical impairment. Third, the ALJ must consider whether the claimant's impairment(s) meet or equal a listing under 20 C.F.R. Part 404,

Subpart P, Appendix 1. An impairment can equal the listings medically or functionally. 20 C.F.R. § 416.924.

A child claimant medically equals a listing when the child's impairment is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). Yet, in order to medically equal a listing, the child's impairment(s) must meet all of the specified medical criteria. "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-32 (1990).

A child claimant will also be deemed disabled when he or she functionally equals the listings. The regulations provide six domains that an ALJ must consider when determining whether a child functionally equals the listings. These domains include:

> (1) Acquiring and using information;
> (2) Attending and completing tasks;
> (3) Interacting and relating with others;
> (4) Moving about and manipulating objects;
> (5) Caring for yourself; and,
> (6) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1). In order to establish functional equivalency to the listings, the claimant must exhibit an extreme limitation in at least one domain, or a marked impairment in two domains. 20 C.F.R. § 416.926a(d).

The regulations define "marked" and "extreme" impairments:

> We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities . . . [it] also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2)(i).

> We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities . . . [it] also means a limitation that is "more than marked."  "Extreme" limitation is the rating we give to the worst limitations.  However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function.  It is the equivalent of the functioning we would expect to find on standardized testing scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3)(i).

During the evaluation of a child disability claim, the ALJ must consider the medical opinion evidence in the record.  20 C.F.R. § 416.927.  A treating physician's opinions should be given controlling weight when they are well-supported by objective evidence and are not inconsistent with other evidence in the record.  20 C.F.R. § 416.927(c)(2).  When the treating physician's opinions are not given controlling weight, the ALJ must articulate good reasons for the weight actually assigned to such opinions. *Id.*  The ALJ must also account for the opinions of the non-examining sources, such as state agency medical consultants, and other medical opinions in the record.  20 C.F.R. § 416.927(e)(2)(i-ii).  Additionally, the regulations require the ALJ to consider certain other evidence in the record, such as information from the child's teachers, 20 C.F.R. § 416.926a(a), and how well the child performs daily activities in comparison to other children the same age.  20 C.F.R. § 416.926a(b)(3)(i-ii).

## IV.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence and whether, in making that decision, the Commissioner employed the proper legal standards. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  "Substantial evidence" has been defined by the Sixth Circuit as more than a scintilla of evidence, but less than a preponderance of the evidence.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535

23

(6th Cir. 1981). Thus, if a reasonable mind could accept the record evidence as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.* While the Court has discretion to consider the entire record, this Court does not determine whether issues of fact in dispute should be decided differently, or if substantial evidence also supports the opposite conclusion. The Commissioner's decision, if supported by substantial evidence, must stand. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387. However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## V.  ANALYSIS

Plaintiff argues the ALJ did not properly evaluate the evidence, nor did she provide reasons to show that substantial evidence supports the ALJ's findings that T.H. has less than marked limitations in Attending and Completing Tasks, less than marked limitations in Interacting and Relating with Others, and no limitations in Acquiring and Using Information. Specifically, Plaintiff contends that the ALJ mischaracterized the evidence by selectively reviewing only the evidence which offered support for her conclusions, and downplaying, or completely ignoring, potentially contradictory evidence which might support a finding for greater limitations. For the foregoing reasons, the undersigned agrees.

An ALJ must discuss relevant evidence and "articulate with specificity reasons for the findings and conclusions that he or she makes." *Orick v. Astrue*, No. 1:10-cv-871, 2012 WL

511324, *5 (S.D. Ohio Feb. 15, 2012) (*quoting Bailey v. Comm'r of Soc. Sec.*, 173 F.3d 428, *4 (6th Cir. 1999)); *see Morris v. Sec'y of Health & Human Servs*., 845 F.2d 326 (6th Cir. 1988). Here, prior to her analysis under each specific domain, the ALJ gives a summary of the record evidence, including the testimony and statements of Plaintiff, his attorney and T.H., teacher and school reports and assessments dated from 2005 to 2012, medical office visit notes from his treating doctors from 2005 through 2012, as well as state agency reviewer opinions dated April 3, 2010.  (Tr. 18-22).  The ALJ then proceeded to analyze the evidence under each domain, pointing to specific pages and exhibits in support of her conclusions that claimant has less than marked limitations in the domains of Attending and Completing Tasks and Interacting and Relating with Others, and no limitations in the domain of Acquiring and Using Information.

Under the domain of Attending and Completing Tasks, the ALJ first acknowledged that the record showed T.H. has some difficulty remaining focused in class and finishing assignments, but that the limitations did not amount to marked limitations.  The ALJ reasoned that T.H. had excellent attendance, is eager to please and enthusiastic about learning, that his learning was not impeded by his behavior, and noting past academic success indicating sufficient discipline to do homework, as evidenced by generally good grades.  (Tr. 25).  In support, the ALJ referenced specific pages from teacher and school personnel statements from both 2007 and October 2010, one sentence from his 2009 IEP without a specific citation, and Plaintiff's statement recorded in notes from a medical office visit from February 2009 indicating "school is going good" and that T.H. was receiving As and Bs.  (*Id.*).  Further, the ALJ found that T.H. continued to exhibit some problem behaviors relating to attention and disruption, but that the overall record showed he had demonstrated the ability to remain on task, exemplified by a classroom observation in March of 2007 when T.H. was on-task 84% of the time and

participating in a reading exercise.  (*Id.*).  She additionally acknowledged that school personnel reported in May 2010 that T.H. was disruptive at times, but that he responded to positive reinforcement, and found he was sufficiently attentive and correctable when misbehaving.  The ALJ bolstered her conclusion with the check-box assessment of T.H.'s teacher, Mrs. Washington, which showed T.H. exhibited only one "very serious problem" out of thirteen possible activities in the domain of Attending and Completing Tasks, specifically his ability to work without distracting himself or others.

Under the domain of Interacting and Relating with Others, the ALJ again found that claimant had less than marked limitations, based on the overall record indicating he had the ability to interact well with others despite not reacting well to bullying.  (Tr. 27).  In support of her conclusions regarding his ability to interact with others, the ALJ found that claimant behaved well during medical treatment sessions, citing a one page Progress Note from an appointment dated October 24, 2005, and a note recounting a positive interaction with another child in the doctor's waiting room, dated September of 2010.  (Tr. 27, 560).  The ALJ also relied on reports from school personnel that claimant behaves well (citing a teacher note indicating he made slight improvement getting along with others during the 3rd Quarter of his Fifth Grade year), was well-mannered and liked to help others in May of 2010, and that a teacher did not say claimant had "significant" difficulty with peer relationships, although acknowledging some difficulty was reported.  (Tr. 27, 349, 382, 582). Further, the ALJ acknowledged claimant did not react well to bullying, and was suspended for two days in 2010 for physical aggression, but was noted as responsive to positive reinforcement when being disruptive in an April, 2010 teacher evaluation.  (Tr. 27, 350, 353, 581, 584).  The ALJ thus concluded claimant "appears to possess an admirable set of social skills" and "is typically able to interact well with others."

Further, regarding Plaintiff's ability to effectively communicate, the ALJ again found claimant had less than marked limitations, determining he retained sufficient social skills and an ability to be understood by others, as his communication difficulties were correctable.  (Tr. 27). The ALJ cited to one page in claimant's IEP, dated December 2, 2009, showing claimant had some communication difficulties with writing and speech, a score of only 77 points (requiring 142 points to meet his age criterion) on a pragmatic language (social skills) profile in 2011, and that his Summit Academy IEP addressed his social skills and language problems.  (Tr. 27, 647, 704). She further acknowledged his father's report that he sometimes speaks too quickly for anyone to understand, that recent school reports showed excessive talking may alienate his peers, and that the record supports that he has some difficulty socializing.  (Tr. 382, 567, 661).  In support of her conclusion, the ALJ found school records indicated his rapid speech can be corrected, pointing to an IEP, amended October of 2010, stating that claimant is able to improve the clarity of his speech with prompting (Tr. 569).  The ALJ also determined the IEP notation that claimant was "sociable," his testimony that he had two friends outside of school, and that his Science teacher noted he was able to work as a member of a team and interact with others on a normal basis, supported her finding of less than marked limitations in this domain.  (Tr. 27, 567, 661).

In support of her finding that claimant has no limitation in Acquiring and Using Information (or at least less than marked, as stated later in the analysis) the ALJ relied on claimant's general testing and academic records demonstrating he was generally functioning within the average range of abilities, from the age of eight through the present, and earning generally good grades, although acknowledging two Fs in April of 2011, and one F back in the Fifth Grade.  (Tr. 23-24, 638-39, 678).  The ALJ again pointed to his March 23, 2007 classroom

observation showing claimant exhibited task-relevant behavior 84% of the time, indicating better functioning than asserted by Plaintiff.  (Tr. 23, 374).  The ALJ acknowledged claimant's 2008-2009 IEP, proposed in 2007, showed below grade level achievement in oral and written expression, which impacted his ability to express himself and complete grade level standards, but determined the record showed claimant had improved since the plan was established in 2007, with "results slowly being demonstrated."  (Tr. 23, 274).  The ALJ followed this with a citation only to the 2008-2009 IEP Statewide and District Testing Plan which indicated he will take his appropriate grade level test of 4/5 grade, with IEP accommodations, as of the IEP meeting date of December 3, 2008.  (*Id.*).

The ALJ also acknowledged a history of claimant being distracted in the classroom, but determined the evidence showed that treatment appeared to have improved his ability to stay focused and learn.  (Tr. 23).  In support, the ALJ again cited Plaintiff's report to his doctor in February of 2009 that "school is going good" and claimant was earning As and Bs, progress notes of Dr. Smith showing claimant told him he was focusing well in all subjects and not in trouble for breaking rules, and that school personnel found claimant was consistently functioning in the average range of cognitive development, although his academic achievement was below that level of ability in written expression and math.  (Tr. 23, 417, 560, 587).  Further, the ALJ concluded his ability to communicate did not appear to hinder his ability to learn, based on claimant's October, 2010 IEP indicating he is able to improve the clarity of his speech with prompting, and its corresponding ETR containing a speech-language pathology evaluation concluding claimant "exhibits age appropriate listening comprehension skills" and "is able to comprehend information regarding what is described."  (Tr. 24, 569, 585).

The undersigned finds the ALJ's domain analysis does not properly demonstrate that her findings are supported by substantial evidence.  Her minimal and piecemeal citations provided in support of her conclusions are insufficient to show she considered all the evidence of record.  It is well established that an ALJ is under no obligation to mention every piece of evidence presented to her to show that such evidence was considered.  *Kornecky v. Comm'r of Soc. Sec.*, *167 Fed. App'x 496, 507 (6th Cir. 2006)* (per curium) (*quoting Loral Defense Systems-Akron v. N.L.R.B., 200 F.3d 436, 453 (6th Cir. 1999)*)).  However, "the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, *774 F. Supp. 2d at 881* (*citing Bryan v. Comm'r of Soc. Sec., 383 Fed. App'x 140, 148 (3d Cir. 2010)* (*quoting Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000)* ("The ALJ has an obligation to 'consider all evidence before him'…and must also 'mention or refute…contradictory, objective medical evidence' presented to him.")).  Although it is up to the ALJ to weight the evidence, she cannot merely disregard evidence that is contrary to her view.  *Id*.  Rather, the ALJ must explain the evidence considered in a way that allows a subsequent reviewer to know why evidence was valued or rejected.  *Id.*

Despite providing some explanation as to her findings, as described above, this Court finds that the ALJ inappropriately glosses over, or omits entirely, evidence that could potentially undermine her conclusions that claimant had less than marked limitations in the three relevant domains.  Even considering the decision in its entirety, including the ALJ's pre-domain analysis summary of the evidence, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored."  *Orick*, *2012 WL 511324* at *5 (*quoting Morris, 845 F.2d 326*, 1988 WL 34109 at *2).  Further, where she did acknowledge conflicting or contrary evidence,

the ALJ failed to explain how such evidence factored into her conclusions.  *See Morris*, 845 F.2d 326, 1988 WL 34109 at *2 ("It is more than merely 'helpful' for the ALJ to articulate reasons…for crediting or rejecting particular sources of evidence.  It is absolutely essential for meaningful appellate review."); *see generally Bailey*, 173 F.3d at *4 ("[A]n ALJ's decision must articulate with specificity reasons for the findings and conclusions that he or she makes.").

The record contains a great deal of evidence that, without being properly considered and refuted, calls into question the supportability of the ALJ's reasoning and conclusions described above.  For instance, the ALJ attempts to show "past academic success" in support of claimant's alleged "sufficient discipline to do homework" based on Plaintiff's statement in February of 2009 that 'school is going good" and claimant earned As and Bs.  (Tr. 25).  However, the record contains evidence showing claimant had ongoing problems with assignment and homework completion, oftentimes leading to low and failing grades.  In 2009, for example, Mrs. Washington reported "obvious problems" in completing class and homework assignments, and claimant's 2010 amended IEP showed he was failing most of his classes as of October 21, 2010, was not successful in his current setting, and did not complete or turn in assignments.  (Tr. 566-67).  Also problematic is that the ALJ clearly cherry-picks statements from claimant's extensive compilation of medical progress notes in support of her finding that the record showed improvement in attention with medication and therapy, ignoring other treatment notes showing medication adjustments and increases to address continuing problematic behaviors, reports from claimant's teachers that he continued to experience breakthrough ADHD symptoms throughout the day, and doctors' observations of symptoms during treatment sessions, including difficulties with attention and communication.  (Tr. 556-57, 602-03, 629, 636, 640).

The ALJ also failed to thoroughly explain her consideration of Ms. McCombie's letter dated November 18, 2010. While not ignored, the ALJ neglects to discuss much of the content. Prior to the domain analysis, the ALJ summarized Ms. McCombie's letter as demonstrating claimant still had problems concentrating and talking in class, but that the behaviors reduced after he takes his medication in the afternoon.  (Tr. 20).  While these statements are not inaccurate, the ALJ failed to acknowledge many specific statements included in the letter that show a potentially higher level of severity in claimant's ongoing problem behaviors.  Not mentioned is claimant's tendency to blurt out comments and talk *continually* during class, that he lacked control of his impulses, required *continual* redirection and prompts to focus, had extreme difficulty focusing on anything when there are any distractions, and had inappropriate angry reactions with other students.  (Tr. 400-01).  Additionally, Ms. McCombie relayed that claimant was not doing well in class because "he hasn't done any work due to his inability to focus," and that, while she states the medication improved his focus, she points out that "[t]he behaviors don't go away, but they are reduced."  (Tr. 401).  The ongoing nature and potential severity of these behaviors is corroborated by other evidence of record, such as medical progress reports throughout the relevant time period showing treatment and medication adjustments and increases for ongoing problem behaviors, as well as doctors' observations of symptoms during sessions, and reports from school of continuing issues.  (Tr. 556-57, 602-03, 629, 636, 640).  The ALJ's failure to incorporate this evidence into her domain analysis, despite previously mentioning it in relation to claimant's apparent improvement after medication, undermines the supportability of her decision.

The Court also finds problematic that, in support of her findings under Attending and Completing Tasks, the ALJ pointed to a check-box statement and reasoned "[claimant's] teacher

said in 2007 that he did not have behavior problems that impeded his learning abilities," but then failed to discuss later school documentation demonstrating academic interference due to his problematic behaviors.  (Tr. 25, 382). For instance, while the ALJ discussed a few specific pages of claimant's Summit Academy Middle School assessment, she made no mention of his teacher's evaluation on October 31, 2011, documenting a problem with excessive talking which could impact his educational performance due to missing important information in class.  (Tr. 661). While the ALJ reasoned that claimant interacts on a normal basis, she failed to mention that, immediately preceding this statement, the evaluator noted his excessive talking may alienate his peers.  (*Id.*).  Additionally, a separate evaluation conducted on November 1, 2011, found claimant's "frequent distractions and outspoken behavior can affect his academic functioning by preventing his overall comprehension, accuracy, and productivity levels for his work.  His inability to comprehend when he should help or intervene can also impact his social relationships."  (Tr. 662-63).

Further, the ALJ found the October 18, 2011 assessment by Sarah M. DiFilippo, M. Ed., LPCC, supported her determination, explaining that claimant's problems mostly include impulsivity and talking out, that he had some trouble making friends, but that he tried hard and is motivated to learn. (Tr. 20, 665).  The ALJ failed to account for other significant findings in the assessment, such as that claimant was in the ninety-ninth percentile for hyperactivity (defined as in the clinically significant range), and was "at risk" in the ninety-fourth percentile for attention problems.  (Tr. 665-66).  Nor did the ALJ mention evidence contrary to the above 2007 teacher statement that his behavior did not interfere with his learning abilities, specifically that he showed:  a "pattern of impulsive and atypical behavior [that] impedes [claimant's] ability to successfully negotiate the demand and expectations of the traditional classroom structure and

routine, interferes with academic progress…[and he] struggles to think before he acts and speaks, which disrupts the class.  This creates issues when it comes to small group activities."  (Tr. 666). Further, the evaluator concluded:  "[Claimant's] high level of activity, impulsive acting out, and difficulty organizing and completing tasks independently will need to be addressed for [claimant] to be successful at school.  Emotional upsets, worry, difficulty expressing feelings and needs, and a tendency to isolate from others, at times, interferes with [claimant's] academic progress." (*Id.*).  Claimant's 2013 IEP showed ongoing problems with impulsivity.  (Tr. 691).

The ALJ also continuously relied on the "correctability" of claimant's speech and attention/disruption issues in the classroom, citing to evidence showing he is responsive to positive reinforcement and redirection in both areas, indicated in her analysis of the three domains currently at issue.  (Tr. 24-25, 27). The ALJ concluded from her analysis that the evidence showed claimant was getting better, and that redirection worked to correct the problem, citing the 2010 amended IEP.  (Tr. 569).  However, a great deal of evidence over the course of the relevant time period, including information on the IEP page cited by the ALJ, showed he required prompting and constant redirection, that his response to redirection is fleeting, and that he is not able to redirect or improve the clarity of his speech on his own.  (Tr. 566-67, 569, 572). In addition to the 2010 amended IEP, such evidence includes Ms. McCombie's letter dated November 18, 2010, and medical treatment reports (some dated as late as 2012) indicating claimant continued to struggle with constant talking and required frequent redirection.  (Tr. 400, 567, 569, 603, 629, 636, 640).  As this evidence could undermine the ALJ's reasoning that continuing behaviors that would have a negative impact on his abilities under these domains can be "corrected," she was required to consider the evidence and explain how it factored into her conclusions.  However, the ALJ does not sufficiently explain her consideration of such evidence,

33

thus it is impossible for the Court to determine whether this evidence "was not credited or simply ignored." *Morris*, 845 F.2d 326, 1988 WL 34109 at *2 (*quoting Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)).

Further, while the ALJ pointed to some instances of good social interaction by claimant, she does not address with specificity her consideration of evidence showing continuing problems with his classmates, such as inappropriate and argumentative interactions described in Ms. McCombie's November 18, 2010 letter, or the ETR report assessments showing he continued to have difficulties maintaining friendships as of May of 2010 and into October of 2011. (Tr. 400-01, 584, 666). Also relevant is that, while the ALJ supported her findings relating to claimant's social skills by pointing out that his science teacher observed he is able to work on a team project without a problem, just a couple weeks prior a behavior specialist noted that claimant's impulsivity, as well as his apparent difficulty with thinking before he acts and speaks, "creates issues when it comes to small group activities," and evidence suggests claimant continued to struggle in this area as of January, 2013. (Tr. 27, 661, 666, 689-91). Rather than explain her reasoning behind weighing this contradictory evidence, the ALJ seems to improperly ignore the evidence that does not support her conclusion.

As the ALJ did not demonstrate she appropriately considered all of the evidence of record, a reasonable mind could not accept her analysis as substantial evidence in support of her conclusion that claimant is not disabled. *See Fleischer*, 774 F. Supp. 2d at 877 (A "court cannot uphold an ALJ's decision…where the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see generally Craig v. Apfel*, 212 F.3d 433, 435-36 (8th Cir. 2000) ("[T]he Commissioner's findings [must be] supported by substantial

evidence which is defined as "relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.").

      The ALJ's assignment of great weight to the opinions of the State Agency reviewers Dr. Mormal, Ms. Hall, and Dr. Hoyle is insufficient to overcome the deficits in her overall analysis of all the record evidence.  The consultants' opinions finding claimant had no limitation in the domain of Acquiring and Using Information, and less than marked limitations in Attending and Completing Tasks, and Interacting and Relating with Others, were offered in March and early April of 2010.  (Tr. 550-51).  As described above, the record contains significant relevant evidence beyond the date of their review showing persistent problems in these domains, including school reports and medical records, which were not considered by the consultants, nor properly analyzed by the ALJ.  While an ALJ may rely on the opinion of a state agency consultant where no medical evidence before the ALJ contradicted that opinion, this does not obviate her responsibility to consider the record evidence in its entirety.  *See generally Kelly v. Comm'r of Soc. Sec.*, 314 Fed. App'x 827, 832-33 (6th Cir. 2009); *see generally Fleischer*, 774 F. Supp. 2d at 881 (*citing Bryan v. Comm'r of Soc. Sec.*, 383 Fed. App'x 140, 148 (3d Cir. 2010) (*quoting Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) ("The ALJ has an obligation to 'consider all evidence before him'" when making a disability finding.); *see generally Brooks v. Soc. Sec. Admin.*, 430 F. App'x 468, 482 (6th Cir. 2011) (ALJ might have relied on a state consultant's dated assessment "if the ALJ made clear that he had considered the effect of the subsequent medical records on the reliability of that assessment.").  Accordingly, the ALJ's statement, within an otherwise deficient analysis, that she gave great weight to the opinions of the state agency consultants does not amount to substantial evidence in support of her overall findings that claimant is not disabled.

The ALJ's insufficient analysis is not harmless, as the evidence undermines her findings in three of the relevant domains, and a proper consideration of the evidence may lead to a finding of a marked limitation in at least two of these domains.  As such, remand is necessary to fully consider all of the evidence of record under each domain, to determine whether claimant's limitations are of a severity as to render him disabled.

## VII. DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is not supported by substantial evidence.  Accordingly, the undersigned orders that the decision of the Commissioner be VACATED, and the case be REMANDED back to the Social Security Administration.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  September 13, 2016